**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| BNSF RAILWAY COMPANY, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Civil Action No. 4:19-cv-00789-P |
| | § | |
| INTERNATIONAL ASSOCIATION OF | § | |
| SHEET METAL, AIR, RAIL AND | § | |
| TRANSPORTATION WORKERS – | § | |
| TRANSPORTATION DIVISION, | § | |
| | § | |
| Defendant. | § | |

## SMART-TD'S ANSWER

Pursuant to Fed. R. Civ. P. 12, Defendant, the International Association of Sheet Metal, Air, Rail and Transportation Workers, Transportation Division ("SMART-TD" or "the Union"), by and through counsel, states the following in response to the allegations contained in the Complaint:

## Introduction

1.      With regard to the allegations contained in the first sentence of Paragraph 1, SMART-TD admits that a group of railroads listed  (collectively, "Plaintiffs" or the "Railroads") have brought an action in their attempt to force the International Union to negotiate over the issue of train crew size and complement ("crew consist"), in violation of the moratorium provisions in the parties' respective collective-bargaining agreements ("CBA"). SMART-TD further avers that Section 2 First of the RLA imposes an affirmative obligation on the Railroads to exert every reasonable effort to make and maintain agreements. SMART-TD specifically denies that it the Railroads are entitled to any relief requested. With regard to the allegations contained in second sentence, SMART-TD only admits that the respective SMART-TD General Committees of Adjustment ("GCA"), which are vested with the authority to make agreements,

1

have, and continue to, abide by the crew consist agreements that they and the railroads have entered into and that such agreements contain moratoriums which currently bar negotiations over crew consist. The allegations contained in the third sentence merely express the Railroads' position in this matter and to that extent it is denied. The allegations contained in the fourth sentence contain legal conclusions to which no response is required. To the extent a response is required, SMART-TD denies the allegations contained therein, and further avers that the moratoriums bar negotiations over crew consist, and that crew consist must be negotiated on a local basis, and not on a craft-wide, system-wide basis. Any and all other allegations are hereby denied.

## Jurisdiction, Parties, and Venue

2.      SMART-TD admits the allegations contained in Paragraph 2.

3.      SMART-TD admits the allegations contained in Paragraph 3.

4.      SMART-TD admits the allegations contained in Paragraph 4.

5.      SMART-TD admits the allegations contained in Paragraph 5.

6.      SMART-TD admits the allegations contained in Paragraph 6.

7.      SMART-TD admits the allegations contained in Paragraph 7.

8.      SMART-TD admits the allegations contained in Paragraph 8.

9.      SMART-TD admits the allegations contained in Paragraph 9.

10.     SMART-TD admits the allegations contained in Paragraph 10.

11.     With regard to the allegations contained in the first sentence of Paragraph 11, SMART-TD only admits that it is an unincorporated association and a labor organization. With regard to the allegations contained in the second sentence, SMART-TD only admits that it is the collective bargaining representative and such representation is carried out through the respective General Committees of Adjustment who have jurisdiction over the specific territory of a specific

2

railroad. With regard to the allegations contained in the third sentence, SMART-TD only admits

that its members, who are employed by certain Railroads, including BNSF, KSC, and UPRR,

perform work in this judicial district. SMART-TD further avers that the remaining Plaintiff

Railroads, including CSXT, Grand Trunk Western, NSR, IC, and BRC do not operate through

this judicial district.

12.     With regard to the allegations contained in the first sentence of Paragraph 12,

while SMART-TD objects to the use of the word "purport," SMART-TD admits that the GCAs

do represent employees on portions of the Plaintiff Railroads. SMART-TD admits allegations

contained in the second sentence of Paragraph 12.

13.     SMART-TD admits the allegations contained in Paragraph 13.

### Collective Bargaining Under the Railway Labor Act

14.     The allegations contained in Paragraph 14 refer to provisions in the Act, which

speak for themselves.

15.     The allegations contained in Paragraph 15 refer to provisions in the Act, which

speak for themselves.

16.     The allegations contained in Paragraph 16 refer to provisions in the Act, which

speak for themselves.

17.     SMART-TD admits the allegations contained in Paragraph 17.

18.      SMART-TD admits the allegations contained in Paragraph 18, and further avers

that the local agreements contain a moratorium period which specifically bars either party from

serving a Section 6 notices on crew consist absent mutual agreement.

19.     SMART-TD admits the allegations contained in Paragraph 19.

<u>The History of Crew Consist Bargaining</u>

20.     SMART-TD objects to the use of the term "contentious" in the allegations contained in the first sentence, but does admit that the parties have bargained over the matter of crew consist. SMART-TD admits the second sentence of Paragraph 20. With regard to the remaining allegations in Paragraph 20, SMART-TD avers that the respective GCAs have, as they are allowed under the RLA, adhered to the terms of the negotiated moratorium provisions, and have opposed the Railroads attempts to circumvent the Act and CBAs. Any and all other allegations are denied.

21.     With regard to the first sentence in Paragraph 21, SMART-TD only admits that historically that train service crews consisted of a conductor and brakemen. SMART-TD further avers that engineers and firemen are in a different craft known as Engine Service. SMART-TD only admits that technology changes have changed railroad operations, but denies the remaining allegations contained in the second and third sentences. With regard to the allegations contained in the fourth sentence SMART-TD only admits that some train service crews did have brakemen. With regard to the fifth sentence, SMART-TD admits that it fought to maintain crews and that the employees were necessary for safety. SMART-TD denies any and all remaining allegations.

22.     With regard to the allegations contained in the first sentence of Paragraph 22, the parties utilized the various methods provided under the RLA to resolve disputes involving a wide range of issues.  With regard to the allegations contained in the second sentence, SMART-TD only admits that the local crew consist agreements generally provided that ground crew positions on each train would be reduced only through the process of "pure attrition." SMART-TD admits the remaining allegations contained in Paragraph 22.

23.     With regard to the allegations contained in the first sentence of Paragraph 23, SMART-TD only admits that the parties did disagree on the issue of crew size. With regard to the remain allegations, SMART-TD only admits that crew size was an issue in PEB 213. SMART-TD avers that the PEB specifically referenced CN&W's <u>precarious financial position</u> in its finding, that inaction could jeopardize the livelihood of *all* of its employees, and recommended that the parties agree that no train will have a crew consist greater than a conductor and one brakeman," subject to "pure attrition." SMART-TD further avers that PEB 213 specifically described "crew consist" as the "crew size issue" and the "manning of engines and trains." Any and all other allegations are denied.

24.     With regard to the allegations contained in Paragraph 24, SMART-TD only admits that the parties abided by the processes provided in the RLA with regard to changing agreements. When the parties were unable to reach agreement on a number of issues, PEB No. 219 was appointed to make recommendations regarding several issues. To the extent the allegations contained in Paragraph 24 refer to PEB No. 219, such report speaks for itself. However, SMART-TD avers that PEB 2 No.19 specifically found that the matter of crew consist was one for local handling. Any and all other allegations are denied.

### The Existing Crew Consist Agreements

25.     With regard to the allegations contained in Paragraph 25, SMART-TD only admits that the terms of the crew consist provisions in the local agreements vary from property-to-property, and that such agreements speak for themselves. With regard to the third sentence, SMART-TD only admits that the parties to the local crew consist agreements generally agreed that any workforce reductions would be accomplished through "pure attrition." Any and all other allegations are denied.

26.     With regard to the allegations contained in the first and second sentences of Paragraph 26, SMART-TD only admits that most of the local crew consist agreements contain a moratorium provision that bars service of proposals until the occurrence of pure attrition. The remaining allegations contained in Paragraph 26 cite to one provision in a local CBA between the respective Plaintiff Railroad and/or its predecessor, which speaks for itself. SMART-TD further avers that the language cited by the Plaintiffs is an incomplete and/or inaccurate representation of the vast and varied agreements on crew consist.

27.     SMART-TD denies the allegations contained in Paragraph 27, and avers that the respective moratorium provisions prohibit the railroads from serving any Section 6 Notice on any issues involving crew consist. SMART-TD further avers that the Railroads arguments to the contrary are frivolous.

28.     To the extent the allegations contained in the first sentence of Paragraph 28 refer to certain local crew consist agreements, each such agreement speaks for itself. SMART-TD denies the remaining allegations contained in Paragraph 28.

**The 2004-06 Litigation**

29.     The allegations contained in Paragraph 29 refer to the Railroads' Section 6 notice dated November 1, 2004, which speaks for itself.

30.     To the extent the allegations contained in Paragraph 30 refer to arguments raised during litigation, specifically *United Transp. Union v. Alton & S. Ry.*, 2006 U.S. Dist. LEXIS 13452 (S.D. Ill. March 10, 2006), such is available to the court for review and such arguments speak for themselves. SMART-TD further avers that crew consist is a "local" issue as a matter of law. The fifth sentence contains conclusions of law, to which no response is required. Any and all other allegations are hereby denied.

6

31.     The allegations contained in Paragraph 31 refer to arguments raised during litigation, specifically *United Transp. Union v. Alton & S. Ry.*, 2006 U.S. Dist. LEXIS 13452 (S.D. Ill. March 10, 2006), such is available to the court for review and such arguments speak for themselves. Any and all other allegations are hereby denied.

32.     The allegations contained in Paragraph 32 refer to arguments raised during litigation, specifically *United Transp. Union v. Alton & S. Ry.*, 2006 U.S. Dist. LEXIS 13452 (S.D. Ill. March 10, 2006), such is available to the court for review and that such arguments which speak for themselves. Any and all other allegations are hereby denied. SMART-TD further avers that while the Railroads concede in footnote 1 that they are not contending their crew consist proposals are subject to obligatory national handling, they contradictorily have requested such in their prayer for relief. SMART-TD specifically denies that it is entitled to such relief.

33.     The allegations contained in Paragraph 33 refer to arguments raised during litigation, specifically *United Transp. Union v. Alton & S. Ry.*, 2006 U.S. Dist. LEXIS 13452 (S.D. Ill. March 10, 2006), such is available to the court for review and such arguments which speak for themselves. Any and all other allegations are hereby denied.

34.     SMART-TD admits the first sentence in Paragraph 34. With regard to the remaining allegations, SMART-TD avers that such refer to the Court's decision in *United Transp. Union v. Alton & S. Ry.*, 2006 U.S. Dist. LEXIS 13452 at *15-*18 (S.D. Ill. March 10, 2006), which is available to the court and which speaks for itself.


### The Belt Railway Crew Consist Dispute

35.     With regard to the allegations contained in the first sentence of Paragraph 35, SMART-TD only admits that BRC served notice on General Committee of Adjustment

7

("GCA") GO-065, the body responsible for "making and maintaining" agreements on behalf of the employees it represents on BRC, to revise its crew consist agreement. The allegations contained in the second sentence refer to a provision in the parties' CBA, which speaks for itself. However, SMART-TD denies that said provision does not bar proposals to change crew size. The allegations contained in the third sentence refer to correspondence between SMART-TD GCA GO-065 and BRC, which speak for itself. SMART-TD further avers that GO-065 is not a party to this action. Any and all allegations are hereby denied.

36.     With regard to the allegations contained in Paragraph 36, such appear to relate to correspondence between SMART-TD GCA GO-065 and BRC, which speak for itself. SMART-TD further avers that GO-065 is not a party to this action. Any and all allegations are hereby denied.

## Proposed Crew Size Regulations

37.     With regard to the allegations contained in Paragraph 37, SMART-TD only admits that on March 15, 2016, the Federal Railroad Administration ("FRA") issued a notice of proposed rule-making ("NPRM") inviting public comment on a proposed rule to require at least two employees in the cab of a locomotive, and that SMART-TD and the Brotherhood of Locomotive Engineers & Trainmen ("BLET") submitted comments and testimony. SMART-TD further avers that such comments and testimony speak for themselves.

38.     With regard to the allegations contained in Paragraph 38, SMART-TD only admits that certain railroads submitted comments and testimony, which speak for themselves.

39.     With regard to the allegations contained in Paragraph 39, SMART-TD only admits that on May 29, 2019, the FRA issued a notice withdrawing the crew size NPRM.  84 Fed. Reg. 24735 (2019).  SMART-TD further avers that such notice speaks for itself.

40.     With regard to the allegations contained in Paragraph 40, SMART-TD only admits that it issued a public statement following the FRA's withdrawal of the NPRM. SMART-TD further avers that such statement speaks for itself, and that several states and unions, including SMART-TD have appealed the FRA's decision, which is currently pending in Ninth Circuit Court of Appeals.

### The 2020 Round of Collective Bargaining

41.     SMART-TD denies the allegations contained in Paragraph 41, and further avers that "crew consist" is a "local" issue, and that absent mutual agreement, it can only be negotiated where it is not barred by the local agreements' moratoria.

42.     SMART-TD admits the allegations contained in Paragraph 42.

43.     With regard to the allegations contained in the first sentence of Paragraph 43, SMART-TD only admits that the parties can serve national and/or local Section 6 notices proposing changes to rates of pay, rules, and working conditions beginning November 1, 2019, and further avers that the Railroads are barred from serving Section 6 notices on crew consist absent mutual agreement per the moratorium provisions of applicable local agreements. SMART-TD denies the remaining allegations contained in Paragraph 43.

44.     The allegations contained in Paragraph 44 refer to each railroad's local Section 6 notice, which speak for themselves.

45.     With regard to the allegations contained in Paragraph 45, SMART-TD only admits that the Chairman of the NCCC, Brendan M. Baron, has informed SMART-TD President Ferguson of its intentions to seek a nationwide arbitration. SMART-TD denies that such is proper for Section 3 arbitration, and specifically denies that a nationwide arbitration is permissible or appropriate.

46.     SMART-TD denies the allegations contained in Paragraph 46.  SMART-TD avers that it intends to abide by the agreements in place as it is permitted under the RLA.  To the extent that crew consist may be open on certain properties, SMART_TD will engage in the mandated process for changing those agreements on a local level.

47.     With regard to the allegations contained in Paragraph 47, SMART-TD only admits that there is no process in the RLA that requires them to bargain pending arbitration over the moratorium language.  Any and all other allegations are denied.

48.     With regard to the allegations contained in Paragraph 48, SMART-TD avers that crew consist is a "local" issue as a matter of law and that bargaining over such matters is done at a local level by the appropriate General Committee. Any and all other allegations are denied.

49.     SMART-TD denies the allegations in Paragraph 49.

### Count One

50.     The allegations contained in Paragraph 50 merely reassert the allegations contained in Paragraphs 1-49. As these allegations have already been responded to above, no further response is necessary here.

51.     The allegations contained in Paragraph 51 contain conclusions of law, to which no response is required. To the extent a response is deemed necessary, they are hereby denied.

52.     SMART-TD denies the allegations contained in Paragraph 52.

### Count Two

53.     The allegations contained in Paragraph 50 merely reassert the allegations contained in Paragraphs 1-52. As these allegations have already been responded to above, no further response is necessary here.

54.     SMART-TD admits the allegations contained in the first sentence of Paragraph 54.  The remaining allegations are denied.

55.     SMART-TD denies the allegations contained in Paragraph 55..

### Count Three

56.     The allegations contained in Paragraph 56 merely reassert the allegations contained in Paragraphs 1-55. As these allegations have already been responded to above, no further response is necessary here.

57.     SMART-TD only admits that the requirement under Section 152 First of the Act apply equally to both carriers and unions. SMART-TD denies that it is refusing to bargain over valid proposals.

58.     SMART-TD denies the allegations contained in Paragraph 58.

59.     SMART-TD denies the allegations contained in Paragraph 59.

60.     SMART-TD denies the allegations contained in Paragraph 60.

61.     SMART-TD denies the allegations contained in Paragraph 61.

62.     SMART-TD denies the allegations contained in Paragraph 62.

To the extent not specifically admitted, any and all allegations of the Complaint are denied.

With regard to the Railroads' Prayer, SMART-TD denies that the Plaintiff Railroads are entitled to any of the relief sought. SMART-TD specifically denies that the Railroads are entitled to declaratory and injunctive relief that SMART-TD is obligated to bargain on a craft-wide, system-wide basis over crew consist, as the Railroads self-admittedly fail to plead such in their Complaint. SMART-TD further avers that it is not a proper party to arbitrate any disputes arising from or relating to the moratorium provisions of existing local crew consist agreements.

### AFFIRMATIVE AND OTHER DEFENSES

### FIRST DEFENSE

The Complaint fails to state a claim upon which relief may be granted.

## SECOND DEFENSE

SMART-TD is not a proper party to this dispute.

## THIRD DEFENSE

The Court is without jurisdiction to grant injunctive relief herein by virtue of the provisions of the Norris-LaGuardia Act, 29 U.S.C. § 101, *et seq*. Plaintiffs failed to comply with the obligations imposed by law prior to unilaterally changing the status quo involved in this labor dispute, have failed to exhaust the available governmental machinery of mediation through the National Mediation Board, have failed to comply with the status quo provisions of Sections 2 Seventh and 6 of the RLA, 45 U.S.C. §§ 152 Seventh, 156, and have failed to comply with their duty to exert every reasonable effort to make and maintain agreements under Section 2 First of the RLA, 45 U.S.C. § 152, Fifth, and are therefore precluded by the provisions of the Norris-La Guardia Act, and particularly Section 8 thereof, 29 U.S.C. § 108, from obtaining the relief sought herein or any injunctive relief.

## FOURTH DEFENSE

The underlying dispute is properly characterized as a "major dispute" under Sections 2 and 6 of the RLA, 45 U.S.C. §§ 152 and 156.

## FIFTH DEFENSE

Plaintiffs' claims are barred by res judicata and/or collateral estoppel.

**WHEREFORE,** having fully answered the Complaint in its entirety, Defendant prays that the relief requested be denied and that the Complaint be dismissed, and that Defendant may have its costs herein, reasonable attorneys' fees incurred, and such other and further relief as the Court may deem appropriate.

## COUNTERCLAIM FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF UNDER THE RAILWAY LABOR ACT

Defendant/Counterclaimant SMART-TD submits the following as and for its counterclaim for declaratory judgment and injunctive relief against BRC, BNSF, CSXT, Grand Trunk, IC, KCS, NS, and UP, (collectively, "the Defendant Railroads"), by and through their representative, the National Carriers Conference Committee ("NCCC"). SMART-TD is in a dispute with the Defendant Railroads as to whether a bargaining proposal served on SMART-TD by their agent, the NCCC, was barred by plain and unambiguous moratoria provisions in local collective bargaining agreements known as "crew consist agreements" with Defendant Railroads. Even though the RLA Section 6 notices are barred by these agreements, Defendant Railroads are attempting to engage in negotiations. Defendant Railroads' actions clearly violate the RLA's obligation to maintain the status quo under agreements, entitling SMART-TD to declaratory and injunctive relief.

## JURISDICTION AND VENUE

1.      The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 2201 (declaratory judgments), 1331 (federal question), and 1337 (Act regulating commerce, *viz.*, the Railway Labor Act, 45 U.S.C. § 151, *et seq.*).

2.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 (b) and (c) because some of the Defendant Railroads operate through this judicial district, and are subject to personal jurisdiction here.

## PARTIES

3.      SMART-TD, formerly United Transportation Union, is the duly authorized representative for the purposes of the RLA of the crafts or classes of train service employees, including Conductors, employed by the Plaintiff Railroads, and is a "representative" as defined

by Section 1 Sixth of the RLA, 45 U.S.C. § 151 Sixth. SMART-TD is located at 24950 Country Club Boulevard, Ste. 340, North Olmsted, Ohio 44070.

4.      BNSF is a corporation engaged in the interstate transportation of goods by rail, and is a "carrier" as defined by Section 1 First of the RLA, 45 U.S.C. § 151 First. BNSF has its principal operating office in Norfolk, Virginia, and operates within this judicial district.

5.      Belt Railway Company of Chicago ("BRC") is a corporation engaged in the interstate transportation of goods by rail, and is a "carrier" as defined by Section 1 First of the RLA, 45 U.S.C. § 151 First. BRC has its principal operating office in Chicago, Illinois, and operates within this judicial district.

6.      CSXT is a corporation engaged in the interstate transportation of goods by rail, and is a "carrier" as defined by Section 1 First of the RLA, 45 U.S.C. § 151 First. CSXT has its principal operating office in Norfolk, Virginia, and operates within this judicial district.

7.      Grand Trunk is a corporation engaged in the interstate transportation of goods by rail, and is a "carrier" as defined by Section 1 First of the RLA, 45 U.S.C. § 151 First. Grand Trunk has its principal operating office in Homewood, Illinois.

8.      IC is a corporation engaged in the interstate transportation of goods by rail, and is a "carrier" as defined by Section 1 First of the RLA, 45 U.S.C. § 151 First. IC has its principal operating office in Homewood, Illinois, and operates within this judicial district.

9.      KCS is a corporation engaged in the interstate transportation of goods by rail, and is a "carrier" as defined by Section 1 First of the RLA, 45 U.S.C. § 151 First. KCS has its principal operating office in Kansas City, Missouri, and operates within this judicial district

10.     NSR is a corporation engaged in the interstate transportation of goods by rail, and is a "carrier" as defined by Section 1 First of the RLA, 45 U.S.C. § 151 First. NSR has its principal operating office in Norfolk, Virginia.

11.      UPRR is a corporation engaged in the interstate transportation of goods by rail, and is a "carrier" as defined by Section 1 First of the RLA, 45 U.S.C. § 151 First. UPRR has its principal operating office in Omaha, Nebraska.

## CLAIM FOR RELIEF

### Collective Bargaining under the Railway Labor Act

12.      Collective bargaining between railroads and their employees' representatives over rates of pay, rules and working conditions is governed by the RLA. Collective-bargaining agreements thereunder exist in perpetuity unless stated otherwise and are only amended through the service of written notice of intended changes in agreements affecting rates of pay, rules or working conditions, pursuant to Section 6 of the RLA, 45 U.S.C. § 156. Such proposals, called "Section 6 Notices," are negotiated in conferences between representatives designated and authorized by the carrier or carriers, and by the collective bargaining representative(s) of their employees. 45 U.S.C. §§ 152 Second, 156. If conferences fail, the dispute is subject to mediation by the NMB. 45 U.S.C. § 155 First. If mediation fails, the President of the United States may appoint an emergency board ("PEB") to investigate and issue recommendations for settlement of the dispute. 45 U.S.C. § 160. Until these procedures are exhausted, and for thirty days thereafter, parties must maintain the status quo established by existing agreements at all times. 45 U.S.C. §§ 152 First, 152 Seventh, 156, 160.

13.      The major railroads in the United States normally bargain as a multi-employer group. Multi-employer collective bargaining in the railroad industry is referred to as "national handling." The Defendant Railroads' national handling agent has been the NCCC. National railroad unions, including SMART-TD, have historically designated national negotiating committees that have engaged in bargaining with the Defendant Railroads' national handling

representative. These negotiations have resulted in national agreements and other settlements of issues in dispute.

### The Status Quo Requirement under the Railway Labor Act

14.     The RLA governs labor relations in the railroad industry.  The principal purpose of the RLA is to "avoid any interruption to . . . the operation of any carrier ... .."  45 U.S.C. § 151a(1).

15.     Section 2 First of the RLA, provides:

> It shall be the duty of all carriers, their officers, agents, and employees to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes, whether arising out of the application of such agreements or otherwise, in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof.

45 U.S.C. § 152 First.

16.     The RLA mandates a very specific procedure to change working conditions. Section 6 of the RLA, provides:

> Carriers and representatives of the employees shall give at least thirty days' written notice of an intended change in agreements affecting rates of pay, rules or working conditions, and the time and place for the beginning of conference between the representatives of the parties interested in such intended changes shall be agreed upon within ten days after the receipt of said notice, and said time shall be within the thirty days provided in the notice. In every case where such notice of intended change has been given, or conferences are being held with reference thereto, or the services of the Mediation Board have been requested by either party, or said Board has proffered its services, rates of pay, rules, or working conditions shall not be altered by the carrier until the controversy has been finally acted upon as required by section 155 of this title, by the Mediation Board, unless a period of ten days has elapsed after termination of conferences without request for or proffer of the services of the Mediation Board.

45 U.S.C. § 156.

17.     Taken together, these sections of the RLA require carriers to maintain the status quo with respect to rates of pay, rules, and working conditions until the mandatory notice, negotiation, and mediation procedures of the Act are completed.

18.     Federal courts are empowered to issue injunctions to stop unilateral action by a rail carrier during this process of resolution.

### NCCC's Section 6 Notice

19.     Defendant Railroads are presently participating in national handling with SMART-TD with respect to Section 6 notices served by each side upon the other in November of 2019.

20.     On November 1, 2019, the NCCC, acting on behalf of Defendant Railroads and the other railroads in national handling, served a Section 6 notice on SMART-TD proposing changes to the parties' collective bargaining agreements.

21.     This Section 6 notice provided, among other things, as follows:

Perhaps the most glaring example of our need for modernization concerns the size and makeup of train crews. In order to take full advantage of new investments in modern technology, reduce human error and better align operational costs with other industries, railroads propose to redeploy conductors from the cab of the locomotive to ground-based positions on territories where PTC or equivalent technologies are enabled. Redeploying employees to ground-based positions in these territories will safely and more efficiently meet the industry's operational and service requirements while providing those employees with higher quality-of-life jobs that allow more employees to spend their nights at home after shifts rather than at hotels.[1]

[1] The railroads maintain that this proposal is subject to bargaining on a multi-carrier basis. However, without prejudice to that position, the railroads do not insist on multi-carrier handling of this proposal, and instead are, by this Notice, inviting SMART-TD to voluntarily address crew consist on multi-carrier basis, without prejudice to any position that the union may wish to take in the future regarding this issue. This proposal is also without prejudice to any similar or identical proposal that any participating railroad may raise in individual or local bargaining.

22.     The proposed changes additionally included the following:

Moreover, in the event that SMART-TD declines to negotiate over crew consist on a multi-carrier basis or the parties are unable to agree on changes in crew consist, the railroads propose an adjustment to compensation, apart from and/or in lieu of the adjustments proposed above, to reduce pay in any circumstance in which a train is required by any labor agreement to operate with more personnel than would be assigned by the railroad based on operational needs alone.

17

23.     With regard to changes to the local moratorium, the Railroads proposed to: "Replace any extant moratorium in local agreements with single, consolidated moratorium."

**The Local Crew Consist Agreement Moratorium Provisions**

24.     SMART-TD has subordinate units called General Committees of Adjustment. These bodies have jurisdiction of SMART-TD's agreements covering specific portions of a railroad carrier, or a predecessor carrier which merged with or was bought by another carrier. General Committees of Adjustment have authority to make local or system agreements with representatives of railroads covering rates of pay, rules, or working conditions subject to ratification in accordance with the SMART Constitution.

25.     Crew consist is a local issue as a matter of law, *see Bhd. of Railroad Trainmen v. Atlantic Coast Line R.R.,* 383 F.2d 225 (D.C. Cir. 1967), *cert. denied,* 389 U.S. 1047 (1968); *see also United Transp. Union v. Alton & Southern Ry. Co.*, No. CIV. 05-190-GPM, 2006 WL 664181, at *3-6 (S.D. Ill. Mar. 10, 2006), and changes to crew size must be negotiated with the SMART-TD General Committees of Adjustment on the appropriate railroad property. In other words, the issue of crew consist is unequivocally *not* subject to national handling.

26.     Local crew consist agreements exist between all SMART-TD General Committees of Adjustment and all Defendant Railroads.

27.     Railroad collective bargaining agreements typically do not contain expiration dates. To establish periods of labor stability between rounds of bargaining, agreements usually contain a provision called a moratorium, which provides that any pending Section 6 notices are deemed settled and withdrawn. In addition, a moratorium bars the service of new Section 6 notices proposing changes in rates of pay, rules or working conditions for a specified period of time.

28.     Most of the local crew consist agreements between the SMART-TD General Committees of Adjustment and Defendant Railroads contain moratoria which bar the service of Section 6 notices regarding crew consist until all the protected employees under those agreements have attrited.

29.     In addition, many of the local crew consist agreements between the SMART-TD General Committees of Adjustment and Defendant Railroads contain language which acknowledges that the crew consist agreement is a local agreement and is not subject to National handling with the NCCC, or some variation thereof.

30.     Since local crew consist agreements are in effect, the General Chairpersons involved advised their carrier that the moratorium provisions of their agreements barred further progression of the Defendant Railroads' Section 6 notice as to the consist of crews. The NCCC disagreed with SMART-TD's position, claiming that the moratoriums do not prohibit them from making proposals regarding crew consist, including changes in minimum crew rules or redeployment of conductor

31.     The RLA governs labor relations in the railroad industry. The principal purpose of the RLA is to "avoid any interruption to...the operation of any carrier...." 45 U.S.C. § 151a(1); *see also, Texas & New Orleans R.R. v. Bhd. of Ry. & S.S. Clerks,* 281 U.S. 548, 565 (1930) ("[T]he major purpose of Congress in passing the Railway Labor Act was 'to provide a machinery to prevent strikes.'").

32.     To avoid interruptions to railroad operations and encourage the peaceful resolution of disputes between carriers and unions, the RLA established two separate mandatory dispute resolution procedures, one for "minor disputes," and one for "major disputes." The terms "minor dispute" and "major dispute" are not found in the RLA itself, but are shorthand terms

developed by the courts to describe the RLA's dispute resolution procedures. *See generally Consolidated Rail Corp. v. Ry. Labor Executives' Ass'n.,* 491 U.S. 299 (1989) ("*Conrail*").

33.     A "major dispute" is a dispute over contract formation or amendment of a collective bargaining agreement. *Elgin, Joliet & Eastern Ry. v. Burley,* 325 U.S. 711 (1945). Parties cannot engage in self-help until after they have exhausted the RLA's major dispute procedures. 45 U.S.C. §§ 152 First, 152 Seventh, 156. As explained previously, the "major dispute" procedures can be initiated by the service of a bargaining notice under Section 6 of the RLA, 45 U.S.C. § 156, as long as such notices are not barred by moratorium provisions in the parties' collective bargaining agreement. *See, e.g., Int'l Longshoremen's Ass'n Local 158 v. Toledo Lakefront Dock & Pellet Co.,* 776 F.2d 1341, 1344 (6th Cir. 1985). The RLA "major dispute" procedures include mandatory conference, negotiation, and mediation between the parties. Until these procedures have been exhausted, the parties are bound by the RLA's "status quo" requirements. *See e.g., Conrail,* 491 U.S. at 302-03; 45 U.S.C. §§ 152 First, 152 Seventh, 156. Once the RLA's major dispute procedures have been exhausted, the parties are free to engage in self-help.

34.     In contrast, a "minor dispute" is a disagreement growing out of the interpretation or application of an existing collective bargaining agreement rather than an effort to reach wholly new agreement terms. *See e.g., Conrail,* 491 U.S. at 303; *Henegar v. Banta,* 27 F.3d 223, 225 (6th Cir. 1994). A dispute is minor "[i]f the dispute can be resolved by reference to the parties' collective bargaining agreement, *i.e.*, if it is 'arguably comprehended within an already existing collective bargaining agreement.'" *Chicago & N. W. Transp. Co. v. Ry. Labor Executives Ass'n.,* 855 F.2d 1277, 1282 (7th Cir. 1988).

35.     "Minor disputes" are required to be addressed by the parties first through conferences and handling "on the property." 45 U.S.C. §§ 152, Sixth, 153, First(i). If the

interpretive dispute is not resolved through such handling, either party may submit the dispute to final and binding arbitration. *Id.* § 153, First(i); *see also Conrail,* 491 U.S. at 303.

**Defendant Railroads Have Violated the Local Crew Consist Agreement Moratoria**

36.     Defendant Railroads have violated most of the local crew consist agreement moratoria by continuing to request bargaining over the Defendant Railroads' Section 6 notice as it relates to crew consist.

37.     Most of the local crew consist agreement moratoria unequivocally provide that parties to those agreements shall not serve or progress, prior to the attrition of all protected employees, any notice or proposal for changing the specific provisions of the local "crew consist" agreements. Said provisions further specify that the crew consist agreement is a local agreement and is not subject to National handling with the NCCC.

38.     Defendants' Section 6 notice, dated November 1, 2019 ("NCCC Notice"), demanding crew consist changes, was served in direct violation of these moratorium provisions, since all of the protected employees have not attrited on the Defendant Railroads.

39.     Defendant Railroads do not have a non-frivolous justification for their breach of the local crew consist moratoria. Their repudiation of the moratoria violates Section 2, First of the RLA, 45 U.S.C. § 152 First, which imposes a judicially enforceable statutory duty on the parties to exert every reasonable effort to maintain agreements. *Chicago & N. W. Ry. v. United Transp. Union,* 402 U.S. 570 (1971). Defendant Railroads' abrogation of the local crew consist agreement moratoria also violates Section 2 Seventh of the RLA, 45 U.S.C. § 152 Seventh ("No carrier ... shall change the rates of pay, rules, or working conditions of its employees, as a class as embodied in agreements except in the manner prescribed in such agreements or section 6 of this Act"), entitling SMART-TD to injunctive relief. *Detroit and Toledo Shore Line R.R. v. United Transp. Union,* 396 U.S. 142 (1969).

40.     The NCCC Notice is, at a minimum, arguably barred by operation of the moratoria provisions in the local crew consist agreements, which must be evaluated separately.

## COUNT I

41.     Plaintiff realleges and incorporates herein by reference paragraphs 1 through 40.

42.     Most of SMART-TD's local crew consist agreement moratoria bar the NCCC's November 1, 2019, RLA Section 6 notice as to crew consist. Defendant Railroads violate the status quo and the plain and unambiguous local crew consist agreement moratoria by seeking to continue to use the RLA's major dispute procedures, including bargaining and mediation, over their crew consist demands.

43.     By abrogating the local crew consist agreement moratoria, Defendant Railroads violate Section 2, First of the RLA by failing to "exert every reasonable effort" to "maintain" the parties' local crew consist agreements. 45 U.S.C. § 152, First. Their abrogation also violates Section 2 Seventh of the RLA, 45 U.S.C. § 152 Seventh, and Section 6 of the RLA, 45 U.S.C. § 156, entitling SMART-TD to declaratory and injunctive relief.

## PRAYER FOR RELIEF

WHEREFORE, SMART-TD asks for judgment against Plaintiff/Counterclaim Defendant Railroads and respectfully prays that the Court, as appropriate:

a.     Issue a Declaratory Judgment that Plaintiff/Counterclaim Defendant Railroads have abrogated the moratoria in their local crew consist agreements with SMART-TD, and have violated Sections 2 First, Seventh, and 6 of the RLA;

b.     Issue injunctive relief enjoining Plaintiff/Counterclaim Defendant Railroads, their officers, agents, servants, employees, and attorneys, from violating the RLA;

c.     Award SMART-TD its costs and attorney's fees incurred in this proceeding, and grant such other and further relief as the Court deems just and proper.

Respectfully Submitted:

   */s/ Sanford R. Denison* 
SANFORD R. DENISON
Tex. Bar No. 05655560
BAAB & DENISON, LLP
6301 Gaston Ave., Suite 550
Dallas, TX 75214
Tel.: (214) 637-0750
Fax.: (214) 637-0730
Email: denison@baabdenison.com

KEVIN C. BRODAR*
Ohio Bar No. 52854
General Counsel
ERIKA A. DIEHL-GIBBONS*
Ohio Bar No. 86424
Associate General Counsel
SHAWN M. MCKINLEY*
Assistant General Counsel
Ohio Bar No. 95836
SMART-TD
24950 Country Club Blvd., Ste. 340
North Olmsted, OH 44070
Tel:  (216) 228-9400
Fax: (216) 228-0937
Email: kbrodar@smart-union.org
Email: ediehl@smart-union.org
Email: smckinley@smart-union.org

*Counsel for Defendant International
Association of Sheet Metal, Air, Rail and
Transportation Workers – Transportation
Division ("SMART-TD")*

* Application for Admission
 *Pro Hac Vice* Forthcoming

## CERTIFICATE OF SERVICE

I certify that on this 15th day of November, 2019 a true and correct copy of the foregoing document was served on counsel for all parties of record listed below by a means permitted by Rule 5(b)(2) of the Federal Rules of Civil Procedure ("F.R.C.P.").

Donald J. Munro
Jones Day
51 Louisiana Ave NW
Washington, DC 20001-2113
202/879-3939
Fax: 202/626-1700
Email: dmunro@jonesday.com

Aaron Samuels Markel
Jones Day
51 Louisiana Ave NW
Washington, DC 20001-2113
202-879-3767
Email: amarkel@jonesday.com

Braden C. Allman
Kelly Hart & Hallman
201 Main Street, Suite 2500
Fort Worth, TX 76102-3685
Tele: 817-878-3501
Fax: 871-878-9821
Email: braden.allman@kellyhart.com

Brian M. Jorgensen
Jones Day
2727 N Harwood St
Dallas, TX 75266-0623
Tele: 214-220-3939
Fax: 214-969-5100
Email: bmjorgensen@jonesday.com

Russell D. Cawyer
Kelly Hart & Hallman LLP
201 Main Street, Suite 2500
Fort Worth, TX 76102-3194
Tele: 817-332-2500
Fax: 817-878-9280
Email: russell.cawyer@kellyhart.com

    /s/ Sanford R. Denison
SANFORD R. DENISON